UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HUSSEIN AHMED,

      Plaintiff,

                                          Case No. 10-14642

v.                                       Honorable Paul D. Borman
                                          United States District Judge

KEYSTONE SHIPPING CO. and
KEY LAKES, INC. and
KEY LAKES I, INC.,

      Defendants.
_____/

OPINION AND ORDER
(1) DENYING AS MOOT PLAINTIFF'S MOTION *IN LIMINE* TO BAR DEFENDANTS'
EMPLOYEES FROM TESTIFYING AT TRIAL (ECF NO. 25); AND
(2) DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION *IN LIMINE*
TO PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT,
ROBERT O. ANDRES (ECF NO. 26)

      This matter is before the Court on Plaintiff's Motion *in Limine* to Bar Defendants' Employees from Testifying at Trial (ECF No. 25) and Defendants' Motion *in Limine* to Preclude the Testimony of Plaintiff's Expert, Robert O. Andres (ECF No. 26). The parties each filed responses and the Court heard oral argument on the motions on October 17, 2012. For the reasons that follow, the Court DENIES AS MOOT Plaintiff's motion to bar certain trial testimony and DENIES IN PART AND GRANTS IN PART Defendants' motion to preclude the testimony of Plaintiff's expert.

**INTRODUCTION**

      This is an action for personal injury under the Jones Act, 46 U.S.C. § 30104 and general maritime law. Plaintiff Hussein Ahmed worked as a seaman on the M/V Presque Isle, a vessel

1

operated by Keystone Shipping Co., Key Lakes, Inc., and Key Lakes I, Inc. (collectively "Defendants"). Plaintiff alleges that on April 19, 2010, he tripped and fell down a companionway in the cargo tunnel of the vessel. Plaintiff alleges that he sustained injuries in the fall, including a herniated disk, which necessitated surgery and physical rehabilitation. Plaintiff claims that (1) Defendants failed to provide a reasonably safe work place and are liable for negligence under the Jones Act and (2) Defendants failed to provide a seaworthy vessel, breaching their duties under general maritime law.[1] Before the Court are Plaintiff's motion *in limine* to preclude the trial testimony of certain employees of Defendants and Defendants' motions *in limine* to preclude the trial testimony of Plaintiff's expert witness.

I.  **BACKGROUND**

Plaintiff, a seaman who worked aboard Defendants' vessel, the M/V Presque Isle, seeks damages under the Jones Act and general maritime law for personal injuries he alleges he sustained as a result of his trip and fall aboard Defendants' vessel. Plaintiff claims that the companionway stair on which he fell and sustained his injuries was unreasonably safe and rendered the vessel unseaworthy. Plaintiff seeks compensatory and exemplary damages, including damages for medical expenses, pain and suffering and wage loss/loss of earning capacity. Defendants deny that the companionway was unfit for its ordinary purpose and deny that the condition of the stairway rendered the vessel was unseaworthy.

---

[1] In addition to his claims of negligence under the Jones Act and general maritime law, Plaintiff sought "maintenance and cure" benefits under the Jones Act. The Jones Act imposes on shipowners a duty to pay maintenance and cure benefits to a seaman who is injured while in the service of the vessel, without regard to fault. On February 8, 2012, this Court granted in part Plaintiff's motion for partial summary judgment, ruling that there was no genuine issue of material fact as to Defendants' liability under the Jones Act for a number of Plaintiff's medical expenses. (ECF No. 20, Opinion and Order.)

Presently before the Court are two motions *in limine*: (1) Plaintiff's motion to strike certain witnesses from Defendants' trial witness list, and to preclude their testimony at trial, based on Defendants' repeated refusal to produce the witnesses for deposition; and (2) Defendants' motion to preclude the testimony of Robert O. Andres, Plaintiff's expert witness, who proposes to testify regarding the hazardous conditions in the companionway where Plaintiff sustained his injuries, the engineering solution that Defendants should have employed to correct the hazardous condition and to opine that the M/V Presque Isle was not a seaworthy vessel because its equipment and appurtenances were not fit for their intended purpose.

## II. LEGAL STANDARD

"The Federal Rules of Evidence, the Federal Rules of Criminal and Civil Procedure and interpretive rulings of the Supreme Court and this court all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures-including motions in limine-in order to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir.1999). District courts have broad discretion over matters involving the admissibility of evidence at trial. *United States v. Seago*, 930 F.2d 482, 494 (6th Cir.1991).

## III. ANALYSIS

### A. Plaintiff's Motion to Bar Defendants' Employees From Testifying at Trial

Federal Rules of Civil Procedure 26 and 30 permit a party to depose any person upon proper notice. Beginning as early as June 16, 2011, Plaintiff began to request via correspondence with Plaintiff's counsel that certain of Defendants' employees, whom Defendants had listed in response to Plaintiff's Interrogatories as potential witnesses in this action, be produced for deposition. (ECF No. 25, Pl.'s Mot. Exs. C and D.) On July 13, 2011, Plaintiff's counsel served Defendants' counsel

3

with a Notice of Taking Depositions of Defendants' employees Terry L. Belmore, Kenneth E. Seneff, Waleed Mohsin, Naji Kuraish and Casey Matheson. *Id.* Ex. E.) Correspondence from Plaintiff's counsel to Defendant's counsel dated August 5, 2011, indicates that Defendants failed to produce the requested witnesses for deposition on July 28, 2011, as properly noticed in Plaintiff's July 13, 2011 Notice. *Id.* Ex. F. Subsequent correspondence from Plaintiff's counsel dated August 12, 2011, October 7, 2011, December 21, 2011 and January 17, 2012 indicates that Plaintiff continued to request, unsuccessfully, that Defendants produce these witnesses for depositions. *Id.* Exs. G-J.

Correspondence from Plaintiff's counsel to Defendants' counsel dated February 3, 2012, indicates that Defendants narrowed their list of employees whom they may call at trial to Tim Knapp, Steve Roane, Ali Ali and Seddik Ali and requesting that these witnesses be produced for deposition. *Id.* Ex. K. In various correspondence beginning on March 21, 2012 and ending on April 30, 2012, Plaintiff sought without success to have these witnesses produced for deposition. *Id.* Exs. L, M. Accordingly, on April 30, 2012, Plaintiff filed the instant motion *in limine* to exclude their trial testimony. In the Joint Final Pretrial Order ("JFPTO"), filed by the parties on May 4, 2012, Defendants list as may call witnesses Terry L. Belmore, Kenneth E. Sneff, Tim Knapp, Steve Roan, Ali Ali, and Sedik Ali. (ECF No. 28, Joint Final Pretrial Order 10.)

Federal Rules of Civil Procedure 26 and 30 authorize a party to depose any person upon proper written notice. There is no question that "[Plaintiff] should have had the opportunity to depose [Defendants'] material witness[es] on important issues prior to the close of discovery..." and certainly prior to their appearance at trial. *Scozzari v. City of Clare*, No. 08-10997, 2012 WL 1988129, at *1 (E.D. Mich. June 4, 2012) (citing *JAT, Inc. v. Nat'l City Bank of the Midwest*, No.

4

06-cv-11037, 2008 WL 1820841, at *3 (E.D. Mich. April 22, 2008)). Defendants' only response to Plaintiff's motion to bar these witnesses from testifying at trial was Defendants' assertion that Plaintiff's counsel should have known that it was "customary" in a Jones Act case for Plaintiff's counsel to come aboard the vessel to depose crew members. (ECF No. 27, Defs.' Resp. 5.)

On October 15, 2012, this Court ordered Defendants to appear at the October 17, 2012 hearing on the instant motions *in limine* with specific dates on which these employee witnesses would be available for deposition, on shore in the City of Detroit, within three weeks of the date of the Court's Order. (ECF No. 42.) At the October 17, 2012 hearing, counsel for Defendants stipulated on the record that the only employee witnesses that Defendants intended to call at trial are Timothy Knapp and Terry Belmore. Defendants will produce Mr. Knapp for deposition on shore in the City of Detroit on Thursday, October 25, 2012 in the afternoon. Mr. Belmore, who is now retired and lives in Rogers City, Michigan, also will be produced for deposition but Defendants request that Plaintiff's counsel consider deposing Mr. Belmore by telephone to obviate the need for Mr. Belmore to travel to Detroit. Plaintiff's counsel agreed to consider this proposal but noted that document review during the deposition and other matters might make a remote deposition difficult. If Plaintiff's counsel concludes that he cannot effectively conduct the deposition by telephone or by video, Mr. Belmore will be produced in Detroit on a date to be mutually agreed upon by the parties as soon as practicable. Regarding the remaining employee witnesses listed by Defendant in the JFPTO, Defendants' counsel will provide Plaintiff's counsel with contact information for those individuals so that Plaintiff's counsel can interview those employees to determine if any of them has information that Plaintiff may wish to present at trial.

Accordingly, the parties having resolved these issues, the Court DENIES AS MOOT

Plaintiff's motion *in limine* to bar the trial testimony of certain witnesses. (ECF No. 25.)

B.  **Defendants' Motion to Preclude the Testimony of Robert Andres**

Under Rule 702, as amended December 1, 2011:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of evidence under Rule 702 bears to burden of establishing its admissibility. *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 593 n. 10 (1993). *Daubert* instructs that this Court is charged with the duty of acting as the "gatekeeper" of expert testimony that fails to meet certain baseline standards of relevance and reliability:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset . . .whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test.

509 U.S. at 592-93 (footnotes omitted). The "unexhaustive" list enumerated by the Supreme Court in *Daubert* includes: (1) whether the expert's theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94. Since *Daubert*, the Supreme Court has extended *Daubert's* holding

beyond purely scientific testimony to all expert testimony involving specialized skill, cautioning that the *Daubert* list of factors is not exhaustive, nor need each factor be considered in every case, emphasizing the considerable discretion afforded a district court in determining the admissibility of expert testimony: "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

The Sixth Circuit likewise has held that the relevance of any one of the factors suggested in *Daubert* will depend upon the facts of a given case: "Our Court has recognized that the *Daubert* factors are not dispositive in every case and should be applied only where they are reasonable measures of the reliability of expert testimony." *Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 682 (6th Cir. 2010) (internal quotation marks and citations omitted). In each case "[i]t is for the district court to determine whether expert testimony is essentially "junk science" rather than testimony falling within the "range where experts might reasonably differ." *Id.* at 681-82.

Plaintiff proposes the expert testimony of Robert O. Andres, an expert in ergonomics and biomechanical engineering, who proposes to testify regarding the ergonomic risk factors presented by Plaintiff's work environment and the unreasonable safety hazards created by the presence of those risk factors. Plaintiff states that Dr. Andres "was retained to assist the trier of fact in understanding the ergonomic underpinnings of the incident in question as it relates to defendants' negligent failure to provide a safe work place and the unseaworthy condition that resulted." (ECF No. 40, Pl.'s Resp. 6.)

7

Ergonomics is defined as "an applied science concerned with the characteristics of people that need to be considered in designing and arranging things that they use in order that people and things will interact most effectively and safely." Webster's Third New International Dictionary of the English Language Unabridged. The Occupational Safety and Health Administration ("OSHA") defines ergonomics, and explains common ergonomic risk factors, as follows:

> Ergonomics is the science of fitting workplace conditions and job demands to the capabilities of the working population. Effective and successful "fits" assure high productivity, avoidance of illness and injury risks, and increased satisfaction among the workforce. Although the scope of ergonomics is much broader, the term here refers to assessing those work-related factors that may pose a risk of musculoskeletal disorders and recommendations to alleviate them. Common examples of ergonomic risk factors are found in jobs requiring repetitive, forceful, or prolonged exertions of the hands; frequent or heavy lifting, pushing, pulling, or carrying of heavy objects; and prolonged awkward postures. Vibration and cold may add risk to these work conditions. Jobs or working conditions presenting multiple risk factors will have a higher probability of causing a musculoskeletal problem. The level of risk depends on the intensity, frequency, and duration of the exposure to these conditions. Environmental work conditions that affect risk include intensity, frequency and duration of activities.

http://www.osha.gov/SLTC/ergonomics/

Dr. Andres is a Certified Professional Ergonomist and earned a Ph.D. in Bioengineering from the University of Michigan. (ECF No. 40-6, Pl.'s Resp. Ex. E, Sept. 21, 2012 Affidavit of Robert O. Andres, ¶¶ 1-2.) He has over 30 years experience conducting biomechanical and ergonomic research and evaluations in a multitude of employment settings and has often analyzed the biomechanical, cognitive, and neurophysical aspects of slips, trips and falls in a variety of environments. *Id.* ¶4. His Curriculum Vitae demonstrates extensive research and publications on the subject of ergonomic engineering in a variety of fields and he has instructed at the University level on the subject of occupational biomechanics. The titles of some of his many research

publications substantiate the breadth of his experience: "Ergonomic analysis of order picking at L.L. Bean;" "A practical synthesis of biomechanical results to prevent slips and falls in the workplace;" "Ergonomic job analyses of picking tasks in a wholesale grocery warehouse distribution center;" "Slip, trip, and fall risks for the older worker: Implications from balance tests;" "Ladder climbing safety; task, equipment, and user characteristics;" "Slips and falls - potential applications of optimization."

Dr. Andres's expert testimony has been received in other federal courts on the subject of ergonomic risk factors associated with the workplace and remedial measures that could have addressed those factors. *See, e.g., Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803, 811 (6th Cir. 1996), *abrogated on other grounds*, *Reeves v. Sanderson*, 530 U.S. 133 (2000) (finding that a jury could reasonably have based its finding of employer's breach duty to provide a safe workplace based upon "[t]he testimony of Dr. Robert Andres, Aparicio's ergonomics expert, show[ing] that there were ergonomic risk factors and known remedial measures that had been described and accepted by the scientific community . . . that a reasonably prudent employer would have known about . . . and taken steps to ameliorate . . ."); *Powers v. Union Pacific Railroad Co.*, No. 07-cv-212, 2009 WL 734707, at *2-4 (E.D. Tex. March 19, 2009) (finding that Dr. Andres was qualified to proffer testimony regarding the ergonomic risk factors associated with railroad switchman and brakeman and the remedial measures available to alleviate those risks and concluding that his testimony was both reliable and relevant). *But see Khoury v. Philips Medical Systems*, 614 F.3d 888, 893 (8th Cir. 2010) (holding that Dr. Andres was testifying outside his field, and his testimony was properly excluded, when he offered an opinion on the proper design of a coronary catheterization machine and held no training or experience in the design of monitor banks or radiation shields).

Dr. Andres appears well qualified to render an opinion on the subject of ergonomic risk factors associated with the workplace environment, as well as to suggest remedial measures that employers could have taken to address those risk factors. Indeed, Defendants do not appear to contest Dr. Andres's qualifications, nor do they question the basic science of ergonomics. Indeed, the Navy has acknowledged the significance of ergonomics (or "human factors engineering") in the planning, development and design of ship systems:

> Designs that disregard the basics of human physical characteristics and cognitive abilities can be associated with inefficient and costly operation and maintenance and with injury or even fatality of the user. Aside from the incurred costs to the Navy for treatment and rehabilitation, injuries mean lost or restricted work time and productivity on the job as well as administrative costs associated with accident investigation and case management. . . . Poor designs, therefore, can and have jeopardized mission effectiveness, program performance, schedule and costs.

http://www.public.navy.mil/navsafecen/Pages/acquisition/ergonomics.aspx#a2.

Defendants concede that Dr. Andres is an "ergonomist" and might be an expert in "how walking on a loose surface such as a railroad ballast might be a problem from a safety point of view," but assert that he has no particular "skills that lend themselves to this particular inquiry." (ECF No. 26, Defs.' Mot. 7.) Defendants complain that Dr. Andres has no background in marine architecture or naval design and therefore is unqualified to opine about the work conditions in the marine environment. Defendants note that individuals who possess such training do exist and would better be suited to offer expert testimony in this case. (ECF No. 26, Defs.' Mot. 6.) Specifically, Defendants assert that:

> Having never been aboard the ship, having never personally observed the conditions, and never having tried to replicate the conditions that existed at the time of Mr. Ahmed's alleged injury, it is impossible for him to claim that he has performed any type of scientific testing or other commonly accepted scientific inquiry to determine the actual safety (or lack thereof) of this particular stairway system.

10

*Id.* at 7. Defendants argue that Dr. Andres, who has only seen photographs of the stairway and area where Plaintiff fell and admittedly has never visited the ship, has done no "testing" nor published any relevant study that has been subject to peer review that would yield a "rate of error" concerning his theory. *Id.* at 8. Defendants object to the proffered testimony of "an expert in Ergonomics [who] looked at some photographs, reviewed some literature, and came to the conclusion that someone fell because a work environment was unsafe." *Id.* at 9.

As *Kumho* and *Tamraz* instruct, the Court's inquiry need not consider each of the *Daubert* factors and "only where they are reasonable measures of the reliability of expert testimony," should they be applied. *Tamraz*, 620 F.3d at 682. Dr. Andres has applied the science of ergonomics in numerous workplace settings, from grocery stores to warehouses to railroad tracks. At the hearing on this motion, counsel for Plaintiff indicated to the Court that in fact Dr. Andres has testified in the specific context of the marine environment in other Jones Act cases, including at a recent trial in this District. While Defendants refer generally to the unique aspects of the marine environment and unspecified "coast guard regulations," they offer no evidence that anything Dr. Andres intends to say is inconsistent with any of these vaguely alluded to novel issues or regulations allegedly relating to this staircase. Nothing Defendants have presented to the Court serves to bring into focus for the Court why the ergonomic risk factors presented by this particular stairway is somehow beyond Dr. Andres's realm of expertise in matters of safe design in the workplace. Defendants have simply not convinced the Court that there is anything inherently "marine related" about the stairway on which Mr. Ahmed fell that would preclude Dr. Andres from testifying as to the ergonomic risk factors presented by the combination of the raised lip, the absence of a handrail, the presence of obtruding objects, the absence of safety paint and the lack of adequate lighting. Nor does the stairway present

11

highly technical design aspects, such as those that prompted the court to reject Dr. Andres's opinion regarding the design of heart catheterization equipment in *Khoury, supra.*

For each risk factor he identifies, Dr. Andres has demonstrated his method of determining the presence of the risk factor, consulting relevant OSHA and Bureau of Shipping standards where applicable, and applying the basic of science of biomechanics and ergonomics to determine the risk posed by this combination factors to Mr. Ahmed as he attempted to descend the stairs on the vessel. Concluding that these factors presented an unreasonable risk of a trip or a fall, Dr. Andres opines further as to the remedial measures that Defendants could have undertaken to avoid the presence of the risk factors, including a very pointed comparison between the port side stairway and starboard side stairway where Plaintiff fell – the port side, unlike the starboard side, having been painted yellow as a safety measure. This is the very "stuff" of ergonomics and has been the subject of Dr. Andres's testimony in other cases, involving multiple different work environments. Dr. Andres also will explain to the jury the human factors involved in the normal swing of a step and how that swing pattern, combined with the design of the stairway on which Plaintiff fell, contributed to Plaintiff's fall.

The Court concludes that Dr. Andres proposed testimony is relevant and reliable and that his testimony will aid the jury in its understanding of the evidence in this case. As noted above, the Navy itself has recognized the importance of considering the ergonomics of design aboard its ships, recognizing that design should take into consideration "the basics of human physical characteristics and cognitive abilities" to avoid injury or even fatalities. Dr. Andres's expert opinion regarding the hazards that precipitated Plaintiffs' trip and fall – the raised lip, the absence of a handrail, the absence of yellow paint and the lack of adequate lighting – and the effect that those hazards pose

given the human cognitive ability to descend a set of stairs, will be helpful to the jury in understanding both the mechanism of Plaintiff's fall as well as Defendants' ability to reasonably have foreseen such an occurrence. If Defendants wish to present counter-evidence to substantiate some special condition of the marine environment that justified the presence of these identifiable ergonomic risk factors, they are free to do so. In fact, however, they have not suggested that such special conditions exist - they have only criticized Dr. Andres for not having a background in naval architecture or marine design.

The Court will permit Dr. Andres's testimony but will preclude Dr. Andres from offering his specific conclusion that the condition of the stairway rendered the M/V Presque Isle "unseaworthy." Federal Rule of Evidence 704 provides in pertinent part: "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, as the Advisory Committee Notes to Rule 704 make clear, the ultimate issue rule does not permit expert opinion testimony that opines on the ultimate legal conclusion which the jury must reach in the case:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Fed. R. Evid. 704 Advisory Committee Note.

In sum, the expert's opinion must stop short of embracing the "legal terminology" which

frames the ultimate legal conclusion which the jury must reach in the case. *See Torres v. County of Oakland, et al.*, 758 F.2d 147, 151 (6th Cir. 1985). In *Torres*, the court concluded that a question posed to an expert, which inquired whether the defendant had discriminated against the plaintiff because of her national origin, ran afoul of the rules of evidence because the question "track[ed] almost verbatim the language of the applicable statute" and the term "discrimination" had a specialized meaning in the law not commonly understood in its lay use. *Id.* "The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. This 'invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law.'" *Id.* at 150 (quoting *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir.), *cert. denied*, 464 U.S. 895 (1983)).

The Court will permit Dr. Andres to testify but will preclude him from proffering the specific conclusion that the M/V Presque Ile was "unseaworthy," an opinion that impermissibly embraces an ultimate legal conclusion in the case.

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES AS MOOT Plaintiff's motion to bar certain of Defendants' employees from testifying at trial and GRANTS IN PART Defendants' motion to exclude the testimony of Dr. Andres.

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

Dated: 10-25-12